I know there's a lot of lawyers on this side at the table. Have you divided arguments? How is this going to work? We have, Your Honor. We've divided the arguments and we're just saying on behalf of two of the defendants, we'll be giving you a road map of what's going on. All right. Let's start with you then. Counsel, Your Honors, may it please the Court. My name is Scott Moore and I represent the plaintiff appellate, Ms. May Ling. I'll be giving my argument from the table today due to the height of the lecture. Certainly. Your Honors, May Ling is a person with disabilities that limit her ability to walk, requires her a useful wheelchair, and limits many of her major life activities. She sought affordable, accessible housing from the subject properties in this case, but needed accommodation for her specific disability to secure that housing. I have a couple of questions. How can it be a denial of equal opportunity to give similarly situated people an equal shot at a lottery? If the lottery were what Ms. Ling was ultimately seeking, that would not be... I'm not asking about what she's seeking. Let's suppose we have one apartment that's disability suitable, and we have 10 people who want it, and we have a lottery to see which one gets it. What is the denial of equal opportunity there? Well, the denial of equal opportunity in this case, Your Honor, was a denial of the unit at No. 014, not a denial with regard to... I was trying to sort out issues by giving you a hypothetical case rather than this case. Let's suppose we have 10 people with the same disability, one apartment that's suitable for them, and we have a lottery to see which one gets it. That would be absolutely an equal opportunity for those who participated in seeking that particular unit, but that certainly wasn't the case here. Here, Ms. Ling sought affordable housing through the CRA program through the City of Los Angeles, and the benefit she was to receive was an affordable housing unit that was accessible to her needs. The lottery was simply a means to arrive at that unit. Why is this case different from my hypothetical case? What's different is the participants in the lottery weren't all people with disabilities that had the same need. In fact, Ms. Ling had a specific need for the unit because of the lack of accessibility to her housing and the accessibility... Oh, you mean... I'm not clear on this. So it wasn't just disabled people in the lottery, it was also people who were, say, poor, so they qualified for Section 8 housing, but they're not disabled? That's correct. The lottery was set up for people who qualified, were income qualified. So whether they were people with disabilities or not disabilities, they were income qualified for the units that were set aside. Those folks did not share the need for the accessibility and didn't face the shortage of accessible units that Ms. Ling faced. So the lottery is not the benefit that was given to the lottery participants or Ms. Ling, it was the housing unit that was available through the affordable housing program. And there are a limited number of accessible units that are affordable there, and the people without disabilities don't share that same need. She got a lousy number in the lottery, so if there was anyone ahead of her who was disabled, she wouldn't be denied an equal opportunity for at least the units that were subjected to the lottery. It would depend on the disability, Your Honor. I mean, if they had a mental disability, or a hearing disability perhaps, something where they didn't need the accessible features that Ms. Ling did, and didn't face the shortage of housing that Ms. Ling did, then no, I wouldn't believe she had an equal opportunity. If they had similar needs for the physical features of that unit, certainly that would be an equal opportunity. But there's no evidence in the record presenting that that unit that was available for her, that was accessible, was given to another person with a similar physical disability. So it's really not an equal opportunity, then she's asking for an opportunity that's greater than individuals who don't have a disability. Absolutely not, Your Honor. The whole concept of reasonable accommodation is certain policies have a more disparate impact on persons with disabilities. The lack of affordable, accessible housing in the city of Los Angeles, as well as through the CRA program, is documented. And the fact that those units are few and far between do not give them the equal opportunity to use all of the affordable units out there, where a person who's able-bodied would have that. Because of that, she requested an accommodation to be put at the head of the line so she could have access to one of the accessible units that are out there. In fact, the unit she lives in right now with her Section 8 voucher isn't even accessible to her. Why would she be entitled to be at the head of the line? I don't get it. Because of the compromise that happens in housing every day, that is, we have a lot of affordable housing units in the city of Los Angeles, yet only a portion of those are accessible to persons with disabilities who are income qualified. So if I'm an able-bodied person where I have the whole aspect of all the CRA units available to apply for, Ms. Link doesn't have that. Because full accessibility is not guaranteed under any law of this country or of this state. Only certain types of units are required to be accessible, and even that accessibility is limited. That's what doesn't give her the equal opportunity to have access to those units. So the accommodation that you're asking for, the way it's supposed to work under your argument is that you've got to take out the people who have certain special needs from the lottery, and then the income qualified people go into a lottery. Folks like Ms. Link who may have special needs then should go into a different lottery? Well, indeed, if they request a reasonable accommodation and they show a necessity because of their disability for that accommodation, we would believe an exception from the lottery process would be appropriate. I think your argument was that they should make additional apartments available for disabled people, and I don't understand why. Their deal with the various government agencies and the federal funding deal is you have to make this many apartments available for disabled people in order to qualify for the funding, and they did. And I don't see why she would be entitled under their deal to make them take a market price unit and turn it into a Section 8 unit where she pays a dollar a month plus her Section 8 voucher and have it specially built out for her disability. So just to clarify for the court, the lottery was the noble property. The issue you're raising... I mix them up, I'm sorry. Yeah, no, I can do it. It's very easy to do. This is the loss. This is the loss. So in the loss, the loss had set aside 28 units in exchange for approvals and financing for the building. They set aside the 28 units for affordable housing. Ms. Link was offered a studio unit, Your Honor, and that unit, however, did not meet her individual needs. But the agreement is to set aside studio units, right? Absolutely. So why doesn't it fundamentally alter the nature of the agreement to ask for a one-bedroom unit? Again, Ms. Link didn't ask to add a unit. She asked to replace the studio unit that didn't meet her needs with the one-bedroom unit. Right, and why doesn't that fundamentally alter the nature of the program? Because the defendants didn't even attempt to negotiate, to request, to ask the CRA, can we replace the units? And there's certainly no way they can come before this court and say... Why should they? I mean, if the deal is studios and she wants a one-bedroom, why should they say, well, we'll talk about a one-bedroom? Because the law is very clear, Your Honor, that covenants are the types of rules and policies that excluded people with disabilities and was mentioned in the congressional history of the Fair Housing Act. And, as this court noted in the City of Edmonds case, even municipal ordinances have done that. So the covenant holds no special place. That is another rule, policy, and procedure from which they have to consider giving a reasonable accommodation. They can't say, well, it's a covenant, we can't do anything about it. If they did, that would totally exempt covenants from reasonable accommodation, which is clearly contrary to what the law requires. So they can't simply say, well, you know, Ms. Lane, this is going to be hard, this is difficult, we have to go through some steps. So it's fundamentally all through the services we provide. There's absolutely no evidence that it did fundamentally. They didn't even seek to amend anything. They just said, we can't do it, covenants should be excluded from the reasonable accommodation provisions. That simply cannot be the case. Can I ask you to address the retaliation claim stemming from the call to the police when she was visiting? Which one was this? Was this NoHo or the loss? NoHo. NoHo, right. Are there factual issues there? Because the person who called the police was operating under the belief that there was a disruption or blocking the entranceway there. And she was told by somebody else that that was occurring, right? Yeah, we believe without a doubt there are genuine issues of material fact. And certainly the court did not read the record most favorable to Ms. Lane in granting judgment as a matter of law. The individual who indicates they had a good faith belief that she was blockading the door was on the property that day, admitted they were on the property that day. They had every opportunity, he had every opportunity to go check to see if she was blocking the door. And he didn't. Moral of the evidence shows that Ms. Lane and the people she was seeking housing with were still on the property too. But his manager told him they were blocking the door? Well, it's unclear we believe from the record. That's what he claimed. I thought what happened was the manager told him, and you're saying he should have checked for himself. Absolutely he should have checked for himself. Why? If your staff person says you're blocking the door, why can't you call the cops? Number one, that the staff person was still giving the tour and the cops showed up beforehand. So there's a question of material fact whether that particular allegation is true. Number two, there's evidence that showed that Mr. Meredith said if she shows up to this property, call the police. We don't want to do business with her. So we have evidence that contradicts Mr. Meredith. Wait, who said that? Say that again? I'm sorry, I missed it. In the record, Your Honor, if you'll give me one second, there is evidence that Mr. Meredith, well, Ms. Lane overheard Mr. Meredith tell the police we do not want to do business with Ms. Lane. So it wasn't about blockading the door. We don't want to do business with Ms. Lane. We want her to leave. And the basic issue of fact, the factual dispute is whether she was inside or outside when the police showed up, in effect. I mean, and there is evidence in the record that she and her companions were still inside the building. I mean, wasn't the blockading supposed to have been outside? That's correct. And also it seems to me, quite candidly, that if, you know, I mean, wouldn't, let's say that the person downstairs giving the tour falsely asserted to the manager that they were outside and blockading. Well, isn't that person, isn't the company responsible vicariously for the false communication that led to the retaliatory act? Absolutely. So it seems to me, you know, candidly I agree with you, I think that this case ought to go back. I'll hear from them and find out why it shouldn't. Yes, and that's exactly true. If the property manager told you that Mr. Meredith was lying, that would be just as much retaliation as if Mr. Meredith had or did not have a good faith belief. Let me, I mean, this may not be in the record, and if so, say so, but the impression I get is that the core of this whole problem is there simply are not enough affordable units under this program for the people who need them, whether low income or low income plus disabled in one way or another. I mean, the impression I get is when you have seven or 80 people signing up for a lottery for the limited number of units, and presumptively most or all of them qualify, it's a programmatic deficiency. There may be programmatic deficiencies, but how it impacts someone like Ms. Ling is certainly different than how it impacts other folks. So in other words, the lack of enough units to meet the needs doesn't matter? Absolutely not, Your Honor. Everyone, Ms. Ling was income qualified for these units just like everyone else. When we look at reasonable accommodation, we look at is there a policy in place that denies her an equal opportunity? And there was, because able-bodied individuals could use those smaller studio units without facing the maneuverability problems, the accessibility problems that Ms. Ling faced. I would have thought that it would actually be quite practical for her to deal with the maneuverability issue, because it's, I think it was over 550 square feet, and they put the partition where she wanted it, so she could have enough room to turn the wheelchair around, that sort of thing. Well, the fact that you would believe that, Your Honor, goes right to our argument, is it's a question of fact. And reasonable accommodation is not about minimum accessibility standards. What the defendants argue and what the district court says is, well, these met minimum accessibility standards, so there's no difference between the units. That, quite frankly, is a ridiculous argument, because size is everything with regard to people who use wheelchairs. And Ms. Ling pointed out that she didn't have the maneuverability space, along with privacy, with her live-in aide, for that studio unit to work for her. If you put an aide in there and a wheelchair in a 528 square foot unit, she testified, that just doesn't work for me. So we need to look at what are her individual needs. That's why reasonable accommodation exists. Congress made a deal. We're not going to make everything accessible. We're not going to make all builders provide what's in fact the Fair Housing Act, which it complies with. Our features of adaptive design are not features of full accessibility. So the fact that we need minimal issues of accessibility does not, reasonable accommodation would be superfluous if minimum standards were enough. We have to take into account Ms. Ling's individual needs. Does she need something that provides greater accessibility? The record... Well, it can't just be a matter of what she says she needs, or what she wants. There has to be something objective about it. Absolutely. The size of her chair, the size of the unit, the fact that she needed a live-in aide, all of those things, she saw the unit, she looked at the unit, and again... Anybody who's rented an office knows what 100 square feet, 200, 500, 600 is. Sure. And that, certainly looking at the fact, and ultimately a jury may say, you know what, Ms. Ling, that small unit would work fine. But that's not why we're here today, Your Honor. We're here today because under the standard, the court is to look at the facts most favorable to Ms. Ling. And Ms. Ling is the person with the disability, using the wheelchair, testifying to what the layout of the property was, why it didn't work for her, and the court ignored that. It said, well, in my opinion, there's no material difference. That was not for the court to decide. The court was to take the record most favorable to Ms. Ling and let the fact finder decide. And it simply didn't do that. You said a few minutes ago that the defendants had not approached the authorities, the city and the CRA, with trying to get some agreement on their part. Was that the defendant's responsibility or the plaintiff's responsibility? It would seem to me that when she's, and this occurred to me as a result of the argument, it would seem to me that the responsibility would be on her to contact the CRA, I don't know whom she would, and say, look, you know, this would be ideal if I had a Kodiak or the Pentagis or whatever the, I don't remember the exact name. Yes, she did approach the CRA. She did approach them. That's why they're defendants in this case. They were complicit in this saying, we don't have to do it either. And we believe in that particular instance, even though, obviously, the defendants controlled it. It is they who failed to make the reasonable accommodation by not, and I'd forgotten it, thank you, because I do remember now. So it is, I mean, they're the ones in charge of the program. They're the ones who have the decision-making authority. And not only is that why they're in, that's, they could have solved this problem by saying, okay, renegotiating the agreement. That's the whole question that overlooks the whole fundamental alteration of the program, but nonetheless, as a practical matter. And again, yes, the defendants say that we have to renegotiate. The CRA says we have to renegotiate. They're both, they're at the table. They could have renegotiated and substituted the unit out, and it would have had no practical impact on the program whatsoever. No impact at all. What about the financial impact, if they'd done that, in terms of, in effect, renegotiated, would they also have made up the difference? How does that work? Again, we asked for the replacement units. We didn't ask for them to add a market rate. But if they take a one-bedroom out of the market, they make less money. We believe the record showed that there was a, there would be a $25 difference in rent if that happened, and Ms. Ling offered to pay the difference. And I'm not sure it does, quite candidly. Well, she offered to pay the difference anyway if they would have presented it to her. And there's no evidence in the record she couldn't. But they didn't want to get that far. How could she? Excuse me? How could she? She can't work. She's disabled. She had some income coming in through supplemental Social Security income, and she has family members, perhaps, that she could have, well, that's not in the record, Your Honor. I take it that at some point, and don't tell me what the discussions were, but at some point the parties tried to informally work this out? Absolutely. Didn't happen, though. It didn't happen. You're here, so obviously it didn't happen. All right, you've got about 40 seconds. Would you like to say? I'll reserve that 40 seconds. All right, thank you. May it please the Court. Again, Theresa Conteh, and I represent Red Rock NoHo Residential and Legacy Management. That is the owner and manager of the loss at which the claim is a failure to accommodate by providing a market rate unit at an affordable price. My colleague, Don Gottesman, represents Guardian, which is the former owner of NoHo 14, a separate property at which the accommodation argument is a failure to accommodate with regard to the lottery. So the lottery is only for NoHo 14, and the swapping of units or changing the price of the unit is only for the loss at NoHo. In addition, I represent Legacy, which is a prior manager of NoHo 14, prior to Mr. Gottesman's client taking over ownership, and is the party to which the retaliation claim is directed at NoHo 14. And then my colleagues, Lon McIntyre and Mark Byrne, respectively represent the CRA of the City of Los Angeles and the City of Los Angeles. And they will be addressing issues having to do with the statute of limitations argument, the responding out superior liability of the city and the CRA, and whether there is a private right of action under Section 504 of the Rehabilitation Act. So you're the person who can tell me why this case shouldn't go back on retaliation? I can indeed, Your Honor. The record is clear that Ms. Ling had a history at NoHo 14. She had a history of going there and intimidating and harassing and badgering the staff and interrupting their conduct of business. She asked questions that she already had been given the answers to over and over again. Every time she came, she asked to tour all the units, even though there were no affordable units available at the time. How many people were with her? I'm sure it's in the record. I'm just curious. I'm sorry, Your Honor. How many people were with her? It varies. She came a number of times. But I mean this time, on the day that we're talking about. I'm not sure it's clearly in the record. Okay. That's okay. And were they also impaired at all? Were any of them in wheelchairs? I believe some of them were. That's the impression I got. Okay. And that happened in the past. Why aren't there factual issues there? I'm wondering the same thing as Judge Carr here. She's put in a declaration, and I think somebody who was with her put in declarations as well, saying we weren't blocking the entrance. And by the time we came down to the lobby, the police had already shown up, and the manager has a different version. Well, that's up for the jury to decide who's telling the truth and what the facts are. That would be true if that were the issue. But that's not the issue. The issue is what is the undisputed fact regarding whether the managers, and it's actually the district managers, claimed to have called the police. Why he did that? What is the undisputed fact in that? And is that a pretext for discrimination? And I think that the facts in the record are clear, that this is someone he had a history with. He knew that she was disruptive to the property. And at this point, he had been told by his employee, who was taking them on a tour, that they had been unlawfully taping the employee. The employee had asked them to stop. It's undisputed in the record that there was a misunderstanding between the employee and this group, that things were not pleasant, and that his position was, there's nothing else we can do for her. She's already been told there are no affordable units. Remind me, was the employee deposed, or did he put in a declaration? No. So nobody knows what the employee said to the guy that called the police? Correct. But Ms. Ling admits that the employee was upset because he felt he was being unlawfully videotaped by the group. But he wasn't deposed? He was not deposed. That's why I see a factual issue there. I'm sorry, Your Honor, I'm missing the factual issue. The manager deposed? Yes, he was. And what did the manager say? He said, the reason I called the police, I had been told by my employee that they were unlawfully taping, I had done everything that I could do for her, there was nothing left for her to do in terms of doing business on this property. It was about the taping, not the blockading? And it was both. And I was told that they were impeding business. Okay. Now, was evidence put on that he was not, in fact, told those things? No. It's absolutely undisputed that those were his motivations. Or that that's what he was told. Right. There is nothing contravening that. So the issue of pretext. Well, contravening it in the sense that she said that didn't happen, and so he's using it as a pretext. Is that not enough to create a genuine disputed issue of fact? I don't think so because, again, the burden is on the plaintiff here, Ms. Ling, to prove that it's pretext. And if she cannot prove that this was not his motivation, and she has nothing in the record that shows any reason why this was not his motivation, that these three reasons, she was impeding business, he was told that she was unlawfully recording the employee, and that there was nothing further that they could do for her, then that was an impediment to the business. Why can't she videotape what's going on? Well, if the other person asked you not to, I think you can. What did he say? I'm sorry? Why couldn't she? What was unlawful about videotaping her tour? She was asked not to. Well, for her not to have my picture taken, that means nobody can take my picture? I don't understand. Why would it be unlawful? Judge, I think I can answer the question. I'm the author of a thing called, a treatise called the Law of Electronic Surveillance. And it's my understanding in the California law, it's a single-party consent state, and it doesn't require both parties to consent to recording or videotaping for it to be lawful. It may not have been a crime. And also this was a, well, but also my point is, seems to me at least raise a question as to the legitimacy of that assertion, because it does put a little different flavor on things if it were in fact unlawful. And I may be mistaken, okay? But I've written this thing for 35 years and updated it twice a year. And it's my distinct recollection the California law does not prohibit single-party recording, even though the person who's being recorded objects. And so if, in fact, as a matter of law, it was lawful, then there is no basis for calling the police. There's no lawful basis for calling the police on that basis. Go ahead. I appreciate that, Your Honor, and I will absolutely defer to you on that. But I will tell you that. The blockading strikes me as more interesting. Was there any more in the testimony about what the manager meant about my employees saying that they're blockading the entrance? I believe his testimony was he was told that they were not an official blockade in the sense that they put themselves across the door, but that they were congregating in the leasing office and impeding the business in that respect. He was off duty that day. He was on site, but he was in a separate office elsewhere and was not dressed for business, and that's why he didn't go out. I had the impression that there was something floating around that they were outside and blocking access. Is that simply a mistake on understanding of the record? I apologize, Your Honor. I'm not clear on that for the record. Okay. And I may not be either, so don't worry. Okay. What I was thinking was suppose that the marshals here told me, stay in your office. Somebody's blockading the entrance. You won't be able to get out. I'm not going to go down and check for myself. But if when I walk out of the building, somebody takes my picture, I'm not going to go run to the marshal. Somebody took my picture. Somebody took my picture. Arrest them. No. I was going to answer and respond to Judge Carr that it is not necessarily a crime, and no one is saying that it is a crime that the group was videotaping the tour and videotaping and recording the statements of the employee. It was, however, not permitted, clearly not permitted. They were told not to do it, and it was not their property. It frankly strikes me as utterly irrelevant. I mean, just a total red herring here. It's the blockading that strikes me as interesting. From this record, I suppose it all depends on demeanor and the details and cross and all that, but a jury I could see concluding that the manager, the guy who called the police, was just aggravated with her, and it had enough because of the history and his knowledge of her repeated visits and called the police. It wasn't that she was really blockading it. He didn't take any steps to sort of verify that. So it might have been a different picture if the staff person had been deposed or put in a declaration, but all of these issues I think the jury is going to need to sort out. But let me ask you a question about the lofts, because as I understand counsel's argument, an accommodation could have easily been done in this case. There was a price differential, but that was $25, and she was willing to pay that, she offered to pay that, and she had approached CRA and said, look, these are my needs. Can we have a substitution here? Is that something that needs to go to the jury as well? No, because that's an incorrect recollection of the record. All right. What is the record? The record is she was offered the Greek unit, the studio unit, because that was the one that was available at the time. These units are always occupied. Obviously there's a high demand. She was offered that unit. She was offered a partition for the unit that could be put wherever she wanted. It could be as high as she wanted. I mean, there was no detail given on that. But if she wanted the privacy that that would be provided. Partition, the way it sounded in the blue brief was it's like those bullpen-type offices where you have a partition but you can see people's legs and you can see their heads if they stand up. There's nothing in the record. Some people call something a partition if it's not a permanent standing wall. It's a wall that you can tear out when the tenant leaves. I don't know. Is there anything in the record about whether it would afford full privacy or not? Absolutely not, Your Honor. There's nothing in the record. I think partition was simply a semantic. That was the word that was chosen in the offer. The intent was to provide a wall for privacy, to create a one-bedroom out of a studio. So there's no evidence that it would deny privacy? No, none whatsoever. There's nothing in the record on the details of the offer in terms of what the partition meant. There's only Ms. Ling's conclusions. I'm thinking she doesn't want to see her caregiver getting dressed and she doesn't want him to see her getting dressed or in bed or whatnot. He probably has to help her get dressed. Fair enough. And I had a landlord who called a wall a partition if it wasn't a supporting wall. But I've also had offices call things partitions when they're kind of like the door in a bathroom stall where you can see above and below, and I don't know which this is. You're saying the record doesn't say? It doesn't say, and I don't think it says one way or the other. I think the intent was to provide the privacy that she wanted. The knowledge is that she wanted a separate bedroom area. The intent of saying, okay, we'll put up a partition for you was to provide that separate bedroom area. But what about the accessibility? The accessibility is exactly the same in the studio units as it is in the one-bedroom units, and that's a key point in this case. That goes to the necessity of the accommodation because not all the studio units are the same size. The Kodak unit is exactly the same size as the Pantages unit, and there are Kodak units in the affordable program. Is there evidence that an available one-bedroom Kodak unit was available to put into the pool? There is no evidence that there was anything ever available other than the one Greek unit. That's why she was offered the Greek unit. So you can't just swap units indiscriminately. No, what she wanted was to take another Kodak unit, Kodiak, whichever. No, another Pantages that is not in the program and swap it for a Kodak that is in the program. It is true that would result in a $25 difference a month in rent. However, she was offered a Greek, and with the Greek being swapped, it would be a $770 difference in rent, which over the course of the year is almost $10,000. So it is not fair to say, well, it's a de minimis financial impact. It is, in fact, a great financial impact. Do you want to save a little bit of time for your colleague? I do, and that goes to the fundamental alteration. Ultimately, we believe the issue is that a landlord should not be required to lower the rent charged as an accommodation, and that's from the Giebeler decision. And I will yield. Good morning, Your Honors. My name is Don Gottesman. I represent the former owner of the NoHo 14, Guardian, who owned the property for 20 months. My client is not implicated in the retaliation claim. My client conducted a lottery for seven below-market-rate units set aside for people with very low incomes. Ms. Ling, the plaintiff, participated in the lottery, was unlucky, drew number 79 out of 87, and the lawsuit followed. Her request was to be exempted from the lottery and to be placed first on the wait list. The legal problem before Your Honors is, what does the word equal mean, within the meaning of the reasonable accommodation provision of the Fair Housing Amendments Act of 1988? Equal opportunity. Well, what kinds of opportunities are equal? Well, as counsel argued it, equal opportunity means equal to similarly situated individuals. So if there were other people with special needs, they would have to be carved out. Because she is asking for an exemption, a carve-out from the general lottery. So I don't know of any specific case law saying that, but maybe you can help me out here. I'll try. I've spent a lot of time pondering the issue of what does equal mean within the meaning of the statute. Equal to what? Equal to whom? The statute doesn't say, and you're right, Your Honor, that the case law on the subject doesn't provide a large exposition on exactly what does equal mean. But I suggest, and using this court's decision in Giebler as a guide, that the word equal, or equal opportunity as used within the statute, means an opportunity made available to non-disabled people that would have been available to the plaintiff had the plaintiff not become disabled. That is the Giebler problem. So if such an opportunity exists, a landlord has to bend the rules a bit to help a disabled person achieve something like that. On the other hand, if an opportunity that would not have been available to a disabled plaintiff had he or she not been disabled, well, that's not an equal opportunity. It's one that a landlord doesn't have to strive to give to a disabled person. Now the question is, if I'm right on that definition, and I think that is what Giebler means, how does it play out in this case? The record shows that at the time Ms. Ling made her request to be exempted from the lottery and to be placed first on the leasing wait list for these seven below market rate units, there were in fact two opportunities available for rental at NOHO 14. One was the opportunity that we've been talking about, which is the opportunity to possibly rent one of these seven units via participation in a random lottery. The other opportunity was available for the other 173 units at full market rate. The record reveals, in my view, without controversy, that even had Ling not become disabled, the only opportunity that would have been available to her in any meaningful sense was the opportunity to participate in the lottery, the very opportunity she got. Why do I say that? Because, first, Ling does not allege anything about her pre-disability income, what she would have been had she not become disabled. But the record does show pretty strongly that she would have been poor, and was poor in fact, regardless of her disability. The record shows that prior to the onset of her disability, she was not employed full time, she had been convicted of a felony based on theft, she had filed for bankruptcy, she was then arrested again for theft, then sent to state prison. All that happened before she was disabled. So, unlike the record in the Giebler case, where the record was very strong and crystal clear that Mr. Giebler, had he not contracted AIDS, would have been able to afford the very high rent. There was no dispute on it. In this case, the record is equally clear that even if Ling had not been disabled, she would have been in exactly the same spot in which she found herself on December 28th of the year 2010. Which is, she would have had the opportunity, as a poor person, to throw her hat in the ring for the lottery, but that is exactly the opportunity she got. There was no need for an accommodation to give her this opportunity, she had it. The opportunity she sought was one that, had she not been disabled, would never have been available to her. I think we understand your argument. Let's hear from counsel for the city and CRA. Thank you, Your Honor. Lon McIntyre on behalf of the Community Redevelopment Agency of the City of Los Angeles, and many of my arguments also apply to the City of Los Angeles, another defendant. I wanted to just clarify a couple of important things. First is the procedural manner in which this case has arrived for decision, both at the district court level and here, in terms of what claims are being asserted against my client and the City of Los Angeles. The court ruled below, in ruling on a motion to dismiss and a motion to amend and file a third amended complaint, that the only potential liability for the City of Los Angeles and the Community Redevelopment Agency is on the Section 504 claim and under a respondeat superior theory of what happened at the lofts, based on behaviors by Red Rock and Legacy at the lofts. There's no federal funding associated with the NOHO 14 program, so there can be no 504 claim against us arising out of that project or that property. The other thing I wanted to clarify, in that same context, is this was not a lawsuit against my client or the City for not having an appropriate covenant or not negotiating fairly about the covenant that was in place. There was a pre-negotiated covenant that provided for 28 accessible, they were all disability accessible units, and that were also affordable units at this project. And that covenant was what was in place and she was requesting an exemption from that covenant. So counsel indicated that she actually approached CRA to try to change the covenant, I suppose to substitute the one-bedroom units for the studio that was set aside? I'm not positive that that's in the record here, but even if it were, it's not part of the claim, in terms of how this case comes to the court against my client and the City. We're only responsible for the respondeat superior liability for what Red Rock and Legacy did. So I'm not sure that that is in the record. If it is, it's not relevant to the issues that were framed by the motion for summary judgment that's now on appeal. The other point I wanted to make is that even if there were some issue about the City or CRA and how they approached the negotiations about the covenant, the request that is being made is a fundamental alteration of that program. There's no way that what she has requested could be offered to her without changing that program, which was the 28 studio units of various sizes dispersed throughout this project, either one of those 28 had to be removed, and it was specific numbers of each type of studio unit. So either one had to be removed from the Affordable Covenant, or we had to add a Pantages unit to accommodate the request. So it is a fundamental alteration, and it did involve significant financial burden, which under Giebler the court said, we don't believe that it would be a reasonable accommodation to expect a financial burden. What's the significant financial burden? I'm sorry? What is the significant financial burden? If she wants a Pantages unit as a 29th affordable unit, then it's $1,572 a month of lost rent. If she wants the Pantages unit swapped for a Kodak unit, then it's $25 a month in rent. But the point is that the request that was being made was that even a Kodak unit wouldn't be satisfactory to her. She wants a Pantages unit, and there was a $1,500 differential on that per month, which Giebler found to probably be unreasonable in any respect. It's really hard for me to keep these straight, but my vague recollection is that Kodak is the identical number of square feet as the unit that was offered to her. The difference is the unit that was offered to her does not have a partition, and they would put it in as she needed it. The Pantages is a much bigger apartment. Have I got that right? Very close. The unit that was offered to her was a Greek unit, which was 530 square feet. The Kodak unit is 930 square feet, which is identical square footage to the Pantages unit. The Greek is 534, and the Kodak is 930, and the Pantages is 930. The Pantages has a wall, a bedroom built into it. The Kodak, then, would be just like the one bedroom, except it would have a partition, and that would just be $25 a month more. No, the Kodak is within the affordable program, and when it became available she would have been eligible for the Kodak with the continuing offer of a partition in that unit. Well, Counselor, you're well over time. Let's see if my colleagues have any additional questions. Judge Kleinfeld? Judge Carr? Was the city going to make some separate arguments, too? There was a statute of limitations argument, but we'll submit on that. All right. Thank you very much. Thank you. Your Honors, may it please the Court. The CRA, on the last time, the CRA was CC-emailed, given all the information of what was going on with Ms. Ling's claims all along, so they were well aware of what Ms. Ling was seeking and could have participated in that. Just to clarify the record, she was never offered a Kodak unit, so this is a red herring. She was never offered a Kodak unit. She was offered the small 528-square-foot unit that would meet her needs. She asked for an accommodation for a unit that would meet her needs, and they just flat-out refused to provide anything but the Greek unit. So that's what this case is about, and that's why we believe the district court did not consider the facts in this case with regard to both the necessity and reasonableness argument. If she had been not disabled, would she have been entitled to a Kodak? If she had been not disabled, she would have qualified. If she had been poor but not disabled, could she have gotten a Kodak for $25 more? She could have gotten the Kodak in the program. She would have qualified for the Kodak just like everyone else, yes. But she was never offered the Kodak. The Kodak was in the program, but they didn't have one available? Well, they didn't offer it. They're saying it wasn't available, but we didn't have that information at the time. Was there a vacant Kodak? The record indicator was not a vacant Kodak at that time. And the Kodak then was within the Section 8 program, so you could get it for your voucher plus a dollar a month, but there were no vacant Kodaks. Yes, Your Honor. But a person without a disability could have rented the Greek unit that was offered, but Ms. Lane did, so that's where there's no equal opportunity. Yeah, the unit was available. If I'm able-bodied, I could have had that. In fact, the next person who was able-bodied got it, but she couldn't have it because of the disability, and they refused to consider any other option. How could she get a Kodak if there were no vacant Kodaks? Well, no vacant Kodaks in the program. There are plenty of other market rate programs to switch out these units. Market rate units they could have switched out. She wanted to change the terms of the agreement to make a Kodak available. Right, to get a unit that was accessible for her. There were plenty of vacant Kodaks, they just weren't part of the Section 8 program? Well, we don't know. Is there a record that there was a vacant Kodak not in the program? There was a record that there was a vacant passengers unit, but we don't know about the Kodak. You're correct, Your Honor. All right. Well, thank you very much, both sides, for your arguments today. The matter is ordered to be submitted for decision by this Court, and we are adjourned until tomorrow morning.
judges: Carr, Kleinfeld, Nguyen